NATIONAL DEVELOPMENT CO. v. LAWSON–PORTER SHOE MACHINERY CORPORATION.

LAWSON–PORTER SHOE MACHINERY CORPORATION v. NATIONAL DEVELOPMENT CO.

Nos. 3758, 3759.

Circuit Court of Appeals, First Circuit.

June 26, 1942.

Cedric W. Porter, of Boston, Mass. (George P. Dike and Dike, Calver & Porter, all of Boston, Mass., on the brief), for National Development Co.

L. G. Miller, of Boston, Mass. (James R. Hodder and Emery, Booth, Townsend, Miller & Weidner, all of Boston, Mass., on the brief), for Lawson-Porter Shoe Machinery Corporation.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

These are cross appeals from an interlocutory judgment entered by the district court·in a suit brought for infringement of claims 1, 2, 3, 13, 14, 16, 18, 19 and 30 of a patent (No. 1,829,800) issued on November 3, 1931, to one Merton W. Howard for an edge setting machine. The validity of the plaintiff's title to the patent is admitted.

The court below found that all of the claims were valid but that only the first three were infringed. Accordingly it entered a judgment dismissing the complaint as to claims 13, 14, 16, 18, 19 and 30; perpetually enjoining the defendant from further infringing claims 1, 2, and 3, and referring the question of damages for past infringement of these claims to a master.

The patent in suit discloses a machine for use in the manufacture of shoes. Its purpose is to mold or "set" by burnishing the rough fibrous edges of the "toplifts", that is the pieces of leather nailed to the bottoms of the wooden heels now very commonly used on women's shoes. Edge setting smooths and polishes the toplifts and improves the appearance of the finished shoe.

Burnishing has long been practiced in the art of shoe making. Originally it was done ·by hand, the shoemaker holding the shoe edgewise between his knees and briskly and forcefully rubbing the edges of both the sole and heel with an iron tool. Later power driven machines were devised to perform this operation, which apparently were reasonably satisfactory as to heels made up as they used to be of superimposed layers of leather, but they were not usable on wooden heels. The reason for this was that heels of this kind require burnishing of the toplift only, and, in addition, when the toplift of a wooden heel is trimmed, the trimming is less accurate at the back of the heel and the surplus leather there must be rolled or pressed into the joint which the toplift makes with the wooden part of the heel so that this joint will be sealed and the entire heel will present a uniform, smooth surface.

Between twenty and twenty-five years ago, when wooden heels became common, their toplifts were "set" by hand on one or the other of two machines. One of these machines consisted of a power driven rotating iron or wheel, the circumference of which had a surface configuration complementary to the configuration to be placed upon the toplift. The edge was set by the operator holding the heel or shoe in his hands with the edge of the toplift parallel to and in engagement with the circumference of the rotating iron, and then rocking and turning the heel in his hands so that the entire circumference of the toplift

came in contact with the iron and the back of it was rolled in.

The other old device, called a bench machine, was wholly hand operated. In view of the defendant's contentions it must be described in some detail. It consisted primarily of a non-rotatable gas heated, edge setting iron or burnishing member, with the desired surface configuration, and a jack or clamp, not unlike a C clamp such as is commonly used by carpenters, both of which mechanisms were arranged on a heavy iron framework designed for attachment to a bench. The heel, with its attached toplift, was held horizontally on its longitudinal axis in the clamp with the edge of the toplift directly under and in contact with the surface of the edge-setting iron. To the clamp was attached a handle by means of which the clamp and the heel held by it could be oscillated back and forth under the iron, the axis of oscillation being parallel to the longitudinal axis of the heel. The edge-setting iron was clamped to a yoke which was pivoted on a line tangent, or very nearly tangent, to the edge of the toplift when it was in contact with the burnishing iron and at right angles to the longitudinal axis of the heel. A handle was attached to the yoke so that it could be rocked on its pivots.

The operator of this machine first put the heel in the clamp, positioning it by centering the toplift on a stop or plate under the setting iron, and then, with his other hand, he tightened the clamp. With one hand he then oscillated the clamp which caused the heel to swing back and forth under the setting iron and in this way the toplift was burnished around the back from one corner to the other. While doing this he rocked the yoke with his other hand which caused the setting iron to tilt so that its edge was pressed more forcefully against the back upper edge of the toplift adjacent to the heel itself and this action molded or rolled the surplus leather on that part of the toplift into the joint between it and the heel. The "breast" which is the front portion of the toplift, could not be set on this machine, but had to be set as a separate operation on another machine.

It is conceded that good work could be done on this hand operated bench machine if the operator was willing to go to the physical exertion of applying the necessary pressure and making a sufficient number of strokes, but since edge setting was done at piece work rates, sufficient effort was seldom exerted and in consequence manufacturers experienced no little difficulty in maintaining a high or even a fair standard of workmanship for this operation. The ordinary operator with this hand machine could set edges at the rate of about six heels per minute. This was the state of the art when Howard entered the field.

The Howard machine, the patent for which the plaintiff owns, is completely automatic. All that is required of the operator is to feed heels into it one by one and to remove them again in the same way when they are finished. Concerning it the court [37 F.Supp. 555, 556], below had this to say: "This was the first automatic edge setting device, and was a vast improvement over the former practice, since it not only provided for much faster edge setting,[1] but it produced a uniform product since the force or power utilized did not vary as it would in a hand operated device, dependent for its force on the human effort put into the operation. After its production the machine was immediately accepted by the trade, and soon completely eliminated the hand operations."

This Howard machine operated upon the same principle as the hand operated one described above, and, like the hand operated machine, it did not set the breast portion of the toplift. Concerning its genesis and operation the patentee testified as follows:

"I thought inasmuch as the hand edge setter could, under the most ideal operation, do a good job, with the exception of two or three things which I will mention, the thing to do was to retain those movements and actions and add the others necessary to make a good machine.

"One principal trouble we always had with the hand machine was that the operator was unable to place the heel in the jack accurately enough, and also was unable to make his oscillations begin and end accurately enough in the matter of degrees of oscillation, so that he was apt to either run his iron past one corner and break the corner in or have it come short and leave it sticking out when the front was cut down.

"Furthermore, he was unable to do the rolling in with accuracy and uniformity on every heel. Pressure was most anything, according to how he felt. The number of

---

[1] With this machine an operator can produce about forty-eight heels per minute.

strokes was most any number, if the foreman wasn't looking, and so on, and my thought was that I could build into a machine the best features of the hand machine plus an oscillation of predetermined length plus a pressure of predetermined amount plus a roll in of accurate placement and quantity or amount, with an electrically heated iron, which would be uniform."

The claims in issue in this suit fall naturally into two groups. The first of these, which will be referred to hereafter as the "roll over" claims, consist of claims 1, 2, and 3. The remaining claims fall into the second group, which will be called the "heel clamping and positioning" or "jack" claims.

Claim 1 of the patent reads as follows:

"A machine for setting the edges of toplifts attached to heels, said machine including, in combination, an edge setting iron, a jack having means for holding the work and presenting the toplift edgewise to said iron, means for relatively oscillating said iron and jack to cause said iron to travel, circumferentially about the edge of the toplift, and means for automatically rocking said iron transversely of said edge about the joint between the toplift and heel."

The wording of claim 2 is the same as the wording of claim 1 except that the word "automatically" is omitted and the phrase "and means to adjust the amplitude of such rocking movement" is added at the end thereof.

Claim 3 reads as follows:

"In an edge setting machine, in combination, an edge setting iron, a jack having means for holding the work and presenting the same edgewise to said iron, means for relatively oscillating said iron and jack to cause said iron to travel circumferentially about the edge of the work, and means for rocking said iron transversely of said edge out of and into normal position, said last-named means being adjustable to vary said normal position and being also independently adjustable to vary the amplitude of the rocking movement."

With respect to this group of claims the defendant, citing Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U. S. 477, 487, 55 S.Ct. 455, 459, 79 L.Ed. 1005, to the effect that "each claim must stand or fall, as itself sufficiently defining invention, independently of the others", contends that all of the claims in this group are invalid because they "do not recite a combination of elements resulting in an automatic edge setting machine. The claims are so broad that they would cover exactly a hand-powered machine which would be no improvement at all over the Exhibit 2 machine,[2] with production no faster than on Exhibit 2 and product no more uniform." We think the defendant arrives at this conclusion by the application of one rule of law to the exclusion of another equally applicable.

While it is abundantly clear, as the Supreme Court has recently had occasion to state, that "it is the(se) claims, not the specifications, that afford the measure of the grant to the patentee" (Milcor Steel Co. v. George A. Fuller Co., 62 S.Ct. 969, 971, 86 L. Ed. ——, decided April 27, 1942), it is equally well established by the same court that "The claims of a patent are always to be read or interpreted in the light of its specifications" (Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 312 U.S. 654, 61 S.Ct. 235, 238, 85 L.Ed. 132) and also that the "drawings may be referred to for illustration and may be used as an aid in interpreting the specification or claim". Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163. For an exhaustive citation of authorities in support of the above propositions see §§ 2 Walker on Patents, Deller's Edition, §§ 261, 262.

The drawings filed with the application for the Howard patent clearly depict not a hand but a power driven machine. And in the specification it is explicitly stated that "The invention has for its general object to provide an automatic machine for rapidly and accurately performing all of the required operations upon the edge of an attached toplift", and further, "The present invention has for an object to provide a machine in which the several factors above referred to[3] are definitely predetermined, by suitable adjustments in accordance with the particular work being operated upon, without further attention on the part of the operator, whose sole duty thereafter consists in inserting and removing the work, the operation of the machine with a given set-up being otherwise wholly automatic." In view of all this, as well as in view of the hand operated machine of the prior art (claims are to be construed in the light of the prior

---

[2] This in the hand operated one described earlier in this opinion.

[3] i. e. a sufficient number of sufficiently forceful strokes with adequate and accurately placed "roll in".

state of the same art, see 2 Walker on Patents, Deller's Edition, § 259), we are of the view that properly construed the claims are limited to an automatic power driven machine, that is, a power operated machine having automatic means for relatively oscillating both the burnishing iron and the jack. This construction of the claims disposes of the defendant's further argument, also based upon the Altoona Publix Theatres, Inc., case, that these claims at the most describe only an automatic rocking device for the burnishing iron, and, since this motion is accomplished by the common mechanical expedient of a cam, the claims are bad for the same reason that the flywheel claims were held bad in the case last cited.

■ But, even as limited to a wholly automatic machine, the defendant contends that the claims are invalid for lack of patentable invention. In brief its argument is that all Howard did was to substitute mechanical for human hands as the operative power for the old bench or hand operated machine, and this being so, the claims are invalid under the rule that converting a hand operated machine to one operated mechanically does not involve an exercise of the faculty of invention. Marchand v. Emken, 132 U. S. 195, 10 S.Ct. 65, 33 L.Ed. 332.

The defendant states the rule too broadly. To conform with the authorities either the word "generally" or the word "ordinarily", or some synonym, should be included in its statement (see Jones v. General Fireproofing Co., 6 Cir., 254 F. 97, 99; Murray Rubber Co. v. De Laski, etc., Co., 3 Cir., 21 F.2d 822, 825; 1 Walker on Patents, Deller's Edition, § 36), but the addition of such a word raises the question of when the rule should be applied and when it should not. On this question the authorities, so far as we have been able to determine, shed little or no light. Cf. the candy pulling machine cases, Schute v. Hildreth, 3 Cir., 8 F.2d 131; Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112. In our view the application of the rule depends primarily upon the complexity of the human movements which a patentee may have succeeded in duplicating mechanically. Certainly no one would seriously contend that the faculty of invention was required in order to substitute a motor, belt and pulley for a boy with a crank as the motive power for an ordinary grindstone. But, on the other hand, we are by no means prepared to say that Cartwright is to be denied standing as an inventor because all he did was to provide mechanical means for operating a loom for weaving textiles such as for centuries had required the manual and pedal dexterity and guiding mind of a weaver.

The question before us in this case, then, is whether or not the faculty of invention was invoked in devising the mechanical means for locking the heel in the jack, oscillating it under the burnishing iron in timed relation to the tipping of the burnishing iron, and then halting the oscillating and tipping movements of the machine and releasing the heel from the clamp so that the operator can remove it from the machine and put in another one. In statement the operations seem complicated enough, and the array of gears, shafts, springs, cams, levers, rods and other mechanical devices required to perform them automatically with mechanical power confirms this conclusion.

■ The court below found "that the plaintiff's device was the result of the application of inventive skill", and we have no doubt that in this case that finding is one of fact. The plaintiff's machine, as indicated above, is a highly complex affair and the wording of the patent is such that the services of experts were required to explain it to and interpret it for the court below. Under these circumstances it is not for us to decide the question of patentable invention for ourselves, but to affirm the finding of the district court on that issue unless we are convinced that its finding thereon is clearly erroneous. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c.

■ In our view the finding of the court below should not be disturbed. Our examination of the patent itself and of the machine made in accordance with its teaching, together with the testimony in the record, leads us to the conclusion that it was not clearly erroneous for that court to have found that the inventive faculty was required to devise the machine described in the claims in suit and consequently that finding is affirmed.

The defendant, although it does not concede that its machine infringes the "roll over" claims, does not press before us the question of non-infringement of these claims. Under these circumstances we see no reason for any elaborate discussion of this issue but will dispose of the matter simply by saying that a careful consideration of the facts convinces us that the district court was not clearly erroneous in finding that these claims were infringed.

This brings us to the second group of claims—"the heel clamping and positioning", or "jack" claims—which the district court found valid but not infringed. Possibly logic requires that a consideration of the question of validity should precede a consideration of the question of infringement, but the requirement is not mandatory because if there has been no infringement the question of validity, so far as the parties to a suit of this sort are concerned, is moot. Consequently, since we are of the view that the court below was not clearly in error in finding non-infringement, we shall confine our discussion to that issue.

In the defendant's machine the operation of the parts is reversed, that is, in the defendant's machine the setting iron oscillates about the heel which the jack holds stationary instead of the jack oscillating the heel under the stationary iron as in the plaintiff's machine. In addition there is incorporated in the defendant's machine a device for setting the "breast" of the toplift, an operation made possible by the fact that the heel is held stationary while in the machine.

Clearly the addition by the defendant of a breast setting device has no bearing on the question of infringement since the plaintiff's machine had none, and the defendant does not contend that by reversing the operation of the parts in its machine it avoids infringement. In its brief it is expressly stated that "We wish it clearly understood that we do not contend that this reversal of operation is in itself a basis for contention of non-infringement."

The question of infringement hinges upon the means and methods of positioning heels in the clamping devices or jacks of the two machines under consideration.

These heel clamping and positioning devices or jacks are vital parts of both the plaintiff's and the defendant's machines since they are the mechanisms which not only hold the heels while their toplifts are being burnished but they also permit rapid feeding and positioning of the heels in the machine. In the plaintiff's machine the jack member consists of a toplift stop plate, positioned under and a little to the left (as the operator faces the machine) of the burnishing iron, against which the bottom surface of the toplift rests when a heel is in the machine. This plate forms one of the jaws of the clamp. The other jaw of the clamp is the one which is movable laterally. It consists of a plate, called the heel seat plate, which is angularly adjustable vertically and slideably mounted, but limited in motion upon a horizontal shaft, also movable laterally, on the left-hand end of which are two sharp projections referred to as spurs. Between the jaws of the clamp and below them is a metal stool or stop, called a breast stop, upon which the breast portion of the heel rests when the machine is in operation. To adjust the machine for a run of heels this breast stop is set so that when a heel is in the machine its toplift will be centered on the toplift stop plate, and the angularly adjustable plate on the movable jaw of the clamp, that is the heel seat plate, is set at an angle to coincide with the angle of the seat, or upper portion of the heel. It and the rod upon which it is mounted are also adjusted so that when the jaws of the clamp are open the distance between them will be about a quarter of an inch more than the height of the heel to be worked on.

To feed the machine the operator grasps a heel by its seat and between the thumb and forefinger of his right hand, holding it with the breast portion down and the toplift or bottom end to his left. He then slides the heel into the jaws of the clamp, positioning it by centering the seat of the heel on the heel seat plate [4] by sense of touch and pushing the heel down until the breast of the heel rests on the breast stop. To close the jaws of the clamp the heel seat plate and the spurred rod upon which it is mounted both move to the left together. This plate, which is forced to the left to the limit of its slideable motion by a coil spring around the rod upon which it is mounted, pushes the heel to the left until the toplift engages the toplift stop, and then, because of the spring behind it, it holds the heel in place while the rod upon which it is mounted continues to move to the left, thereby compressing the spring behind the heel seat plate, projecting its spurs through the heel seat plate, and embedding them firmly into the seat portion of the heel. By means of these spurs the heel is pressed forcefully

---

[4] The specification of the patent provides: "Interchangeable plates corresponding to different widths of heels are provided, a plate being chosen which is of substantially the same or only slightly greater width than the particular heels to be operated upon."

against the toplift stop and thus held firmly in position while the machine is in operation.

The jack member of the defendant's machine is very similar to the one just described but the method of positioning heels in it is said by the defendant to be wholly different. It contends that the heel seat plate in its machine, which it calls the "guard plate", is not designed for use, nor is it usable as a positioning device but that the positioning of the heel in its machine is accomplished by centering the toplift end of the heel on the toplift stop by sense of touch on the breast stop. That is, it contends that operators of its machine grasp the heel not around its seat portion but around its shank or middle portion and center it in the jack by placing the toplift against its stop and touching the edges of the breast stop, the heel seat plate or guard plate, serving only to protect the operator from injuring his fingers on the spurs and to push the heel off the spurs when the jack opens to release the heel. The plaintiff contends that this is not so at all, but that operators of the defendant's machines actually use its guard plate as a positioning device, as they must in order to operate the machine at the speed at which it is designed to operate, and that this use of the plate was fully contemplated by the defendant when it designed its machine.

On this issue the district court had this to say:

"The breast plate on the defendant's machine provides a resting place for the heel, and in conjunction with the toplift seat positions the heel so that the toplift face is perpendicular to the axis of oscillation and the proper operation may occur. It is difficult to see what positioning function the guard-plate can exercise when the heel is first placed in the machine since it is separated from the heel seat at the beginning of the operation. The best positioning would not occur by placing the heel seat against this guardplate, but as outlined above. However, it is noted that when the points engage the heel seat this operation does not occur by merely moving the points forward, but occurs by moving the guard and the points in unison. Thus, while the points engage the heel seat some portion of the guard-plate necessarily comes in contact with the heel seat. This is not a positioning device, but is part of a clamping device. In other words, the guard-plate does not assist in guiding the heel into proper position or in positioning it, but it does assist in clamping the heel seat securely after positioning so that when the edge setting iron exerts pressure on the heel it is firm."

In finding non-infringement the court below in its opinion said:

"The question of infringement of these claims relating to positioning and clamping is not free of doubt. While the defendant uses its spur-guard, which is likewise fixed at an angle to approximate the wedge angle, as a member of its clamping device, it in nowise positions the heel through the use of this guard. In the operation of its device, positioning occurs only through the breast plate and the toplift seat. As a matter of fact, it would be possible to utilize this guardplate for positioning only under the most favorable circumstances, and then by a very fine adjustment of the convex guardplate to fit the concave heel seat. Giving the plaintiff all to which it seems entitled, I find that the defendant's device does not infringe the claims relating to positioning and clamping."

In this case we can have no doubt that this finding of non-infringement is one of fact and consequently it is not to be reversed by us unless in it we find clear error. This we do not find. The District Judge saw the machines in operation and he heard the conflicting testimony of experts. An operator of one of the defendant's machines, called by the defendant, testified that the heel seat plate thereon, as a practical matter, was never used as a positioning device, and an expert on shoe machinery, also called by the defendant, testified that in his opinion that plate was so constructed that it could not be so used. To refute this the plaintiff contends that the testimony of the defendant's experts is inherently incredible and advances ten different arguments in support of its position. We find none of them convincing.

We might discuss each of these arguments in detail but to do so would greatly expand this opinion without, in our judgment, serving any useful purpose. Under these circumstances it seems to us sufficient to say that all the ten arguments, although based upon the testimony of expert witnesses called by the plaintiff who disagreed with those called by the defend-

ant, are not to be accepted for that reason, and that we find nothing inherently incredible in the testimony adduced by the defendant. There being a conflict in the testimony it was the duty of the court below, before which the witnesses appeared, to weigh that testimony, and, having done so and reached a reasonable conclusion, it is not for us to reverse.

The judgment of the District Court is affirmed. without costs.