**In the Matter of the Application of Van Russell GAERTNER.**

**Appeal No. 79-528.**

United States Court of Customs and Patent Appeals.

Aug. 2, 1979.

Arnold H. Cole, St. Louis, Mo., atty. of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Henry W. Tarring, II, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and RE,* Chief Judge.

* The Honorable Edward D. Re, United States Customs Court, sitting by designation.

MARKEY, Chief Judge.

The Patent and Trademark Office (PTO) Board of Appeals (board) affirmed the rejection under 35 U.S.C. § 185 of application No. 599,574 filed July 28, 1975, and entitled "Oxazolidinone Phosphonates." We affirm.

### Background

On June 17, 1974, Gaertner filed application No. 479,932 (parent) directed to a class of herbicidal compounds having the formula:

wherein R and $R^1$ are each selected from alkyl of 1 to 6 carbon atoms, alkenyl of 3 to 4 carbon atoms, and the mono-chloroderivatives of such alkyl and alkenyl. As disclosed in the application, the compounds are generally prepared by first reacting methyl or ethyl glycinate with formaldehyde and then adding an aliphatic phosphite diester to the reaction product. R and $R^1$ are determined by the ester groups on the aliphatic phosphite reactant.

The specification contains five detailed examples describing the preparation of specific compounds within the class. Example 1 teaches:

### EXAMPLE 1

A suitable reaction vessel is charged with 25.2 grams (0.2 mole) of methyl glycinate hydrochloride in 100 ml. of methanol. The solution is stirred during neutralization with 25% sodium methozide solution in methanol, after which 2.5 grams of hydrochloride is added. The resultant solution is filtered to remove salt, and 32 grams (0.4 mole) of 37% formalin is added slowly with cooling to maintain the temperature below 30°C. After stirring for about 15 minutes, 27.6 grams (0.2 mole) of diethyl phosphite is added at one time.

The mixture is stirred and heated to distill methanol, and then 250 ml. of toluene is added and the temperature raised to azeotrope water. The mixture in toluene is heated at about 115°C. for 1 hour, after which it is cooled, and the cooled solution decanted from a small insoluble residue. The toluene is distilled down to 1 mm./70°C., and the residual oil is cooled, followed by the addition of 300 ml. of ether. The solution is then filtered, and the ether is stripped leaving a dark amber oil.

This oil is distilled in a molecular still at 155–165°C. wall temperature at $3\mu$, and the yellow oil obtained is redistilled in a magnetically stirred molecular still at 100–129°C. bath temperature at $4\mu$. The product obtained is N-(diethoxyphosphinylmethyl)oxazolidin-5-one, $nd^{22}$ 1.-4548. Elemental analysis gives 40.34% carbon, 7.04% hydrogen, 5.73% nitrogen and 13.07% phosphorus as against calculated values of 40.51%, 6.80%, 5.91% and 13.06% for $C_8H_{16}NO_5P$.

Examples 2 through 5 differ from Example 1 only in the aliphatic phosphite diester selected and in the distillation conditions employed. The application contains eight claims directed to the compound per se. Claim 1, the sole independent claim, generically recites the entire class of compounds. Claims 2 and 4 are sub-generic. The remaining five claims are each specific to a different one of the compounds prepared in Examples 1 through 5.

On January 17, 1975, the examiner rejected claims 1, 2 and 4 under 35 U.S.C. §§ 101, 112,[1] finding "no adequate teaching of how

---

1. 35 U.S.C. § 101 provides:

   § 101. Inventions patentable
   Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

   35 U.S.C. § 112 provides, in pertinent part:
   § 112. Specification
   The specification shall contain a written description of the invention, and of the manner and process of making and using it, in

to use any compounds other than those of the examples" and "no examples, of *any* kind, of *any* chloro compounds." (emphasis in original). Gaertner deleted the monochloro derivatives from the specification and claim 1. The application was allowed on May 14, 1975 and thereafter became abandoned on August 14, 1975 for nonpayment of the issue fee.

On July 28, 1975, Gaertner filed the instant application No. 559,574. The accompanying declaration labels it a continuation-in-part (CIP) of the parent containing "subject matter * * * not common to said earlier application." The instant application differs from the parent as filed in three instances, one being the identification of the parent at the beginning of the specification as required by 37 CFR 1.78(a). A second difference is the addition of an Example 6 describing the use of di(2-chloropropyl) phosphite, a known aliphatic diester, in the preparation of a compound within the above formula wherein R and R$^1$ are 2-chloropropyl, a mono-chloro derivative. More specifically, Example 6 teaches:

## EXAMPLE 6

A suitable reaction vessel is charged with 12.5 grams (0.1 mole) of methyl glycinate hydrochloride in 50 ml. of methanol. The solution is stirred during neutralization with 25% sodium methoxide solution in methanol, after which 1.3 grams of additional hydrochloride is added. The resultant solution is stirred for about 30 minutes and filtered. The fil-

trate is placed in an ice bath, and 16 grams (0.2 mole) of formalin is added. After stirring for about 1 hour, the solution is concentrated in a rotary evaporator at μ30°C. to remove methanol. It is then diluted with benzene, dried over anhydrous sodium sulfate, and further concentrated in the rotary evaporator.

The residual oil is dissolved in 100 ml. of benzene and treated immediately with 23.5 grams (0.1 mole) of di(2-chloropropyl)phosphite. About 4 drops of concentrated HCl is added, and the product is concentrated in the rotary evaporator starting at μ20°C. and up to steam temperature, finally at μ0.5mm. An oil is obtained, and a portion of that oil is distilled in a molecular still at 145–159°C. wall temperature at 5–8 μ, and finally at 1 μ. The product obtained as a viscous oil is N-[di(2-chloro-1-propoxy)phosphinylmethyl]oxazolidin-5-one, Nd$_{22}$ 1.4812.

Elemental analysis gives 21.24% chlorine, 4.13% nitrogen and 9.19% phosphorus as against calculated values of 21.22%, 4.9% and 9.27% for $C_{10}H_{18}Cl_2NO_5P$.

The remaining difference is the addition of dependent claim 9 which is specific to the compound prepared in Example 6.

The CIP declaration acknowledges the prior filing, by Gaertner's assignee, of nine foreign counterparts of the CIP, including Example 6, just before June 17, 1975. The PTO Group 220 (Security Group), Licensing and Review Section, denied Gaertner's petition for a retroactive license for foreign filing under 35 U.S.C. § 184,[2] finding that

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

2. 35 U.S.C. § 184 provides:
§ 184. Filing of application in foreign country
    Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent or for the registration of a

utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the departments and the chief officers of the agencies who caused the order to be issued. The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title.
    The term "application" when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof.

he had not provided the required *verified* showing of facts and that his showing indicated no inadvertence in filing abroad without a license. Gaertner's petition to the Commissioner was denied. The examiner then rejected "the application" under 35 U.S.C. § 185 [3] for non-compliance with the licensing requirements of 35 U.S.C. § 184.

### The Board

The board agreed that Gaertner's non-compliance with the statutory licensing requirement was fatal, finding that the "additional subject matter involving the mono-chloro derivative of Example 6 and claim 9 is not merely identical in scope to the subject matter disclosed and claimed in appellant's parent application." [4] Gaertner's argument that the additional subject matter was neither "material" nor "essential" was found inconsistent with his abandonment of the parent, made allowable by cancellation of the "mono-chloro" matter, in favor of a CIP containing that same matter. The board emphasized that "application," as used in 35 U.S.C. § 184, includes "any modifications, amendments, or supplements thereto, or divisions thereof."

### Issue

The sole issue is whether Gaertner's CIP application was properly rejected under 35 U.S.C. § 185.

3. 35 U.S.C. § 185 provides:
   § 185. Patent barred for filing without license
   Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assisted another's making, application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention. A United States patent issued to such person, his successors, assigns, or legal representatives shall be invalid.

4. Gaertner does not here challenge this statement of the board concerning the PTO's refusal to grant a retroactive license:

### OPINION

#### General Considerations

Respecting inventions made in the U.S., 35 U.S.C. § 184 prohibits the filing of a foreign patent application prior to six months after filing a corresponding U.S. patent application unless a license is obtained from the Commissioner of Patents. No patent will be granted on an application in violation of 35 U.S.C. § 184 and any U.S. patent issued in violation of the section is invalid. 35 U.S.C. § 185.

The purpose of those statutes being to prevent exportation of information potentially detrimental to the security of our country, S.Rep.No.1001, 82d Cong., 2d Sess. 1–3 (1951), *reprinted in* [1952] U.S.Code Cong. & Admin.News, pp. 1321, 1321–23 (Senate Report); *Beckman Instruments, Inc. v. Coleman Instruments, Inc.,* 338 F.2d 573, 576, 143 USPQ 278, 280 (CA7 1964); *Union Carbide Corp. v. Microtron Corp.,* 254 F.Supp. 299, 302, 149 USPQ 827, 829 (W.D. N.C.1966), *aff'd,* 375 F.2d 438, 153 USPQ 152 (CA4 1967), Congress intended that strict compliance be paramount to the interests of the individual inventor. *See* Senate Report, *supra* at 4, [1952] U.S.Code Cong. & Admin.News at 1324.[5]

Section 184 speaks of "an *application* for patent * * * in respect of an invention," (emphasis added), making the disclo-

> We do not have jurisdiction to review in any manner the propriety of the Commissioner's decision refusing to grant a foreign filing license. That matter is closed, as pointed out by the Examiner in his Answer. It was a petitionable question, not an appealable one. The remedy if any from the Commissioner's decision of June 8, 1976 would have been by mandamus to the Federal Court, not to this Board.

5. 35 U.S.C. § 186 provides for criminal penalties upon conviction of one who "in violation of the provisions of section 184 of this title" files an application in a foreign country "in respect of any invention made in the United States." That one may with impunity disclose an invention in foreign countries by means other than an application is an irrelevant consideration where, as here, appellant's action does not fall within that apparent statutory void.

sure of the U.S. application the sole device available to the PTO, absent a licensing petition, for determining what information an applicant might send abroad. The six month statutory waiting period provides an opportunity to examine that application to determine whether it contains national security material. Senate Report, *supra* at 1–3, [1952] U.S.Code Cong. & Admin.News at 1321–23; *Beckman Instruments, Inc. v. Coleman Instruments, Inc., supra* at 576, 143 USPQ at 280.

The purpose of the statute could be frustrated if the corresponding foreign application contained information not present in an examined-for-security-material U.S. application or in a license for foreign filing. Congress clearly denied applicants the right to determine for themselves whether a particular disclosure was detrimental to national security, in providing that applications must be licensed for foreign filing or must have been on file as a U.S. application for the requisite six month period.[6] The second paragraph of section 184 extends those requirements to any modification, amendment, supplement or division of the foreign application which results in the disclosure of "new" information. Likewise, any modification, amendment, supplement or division adding information to a previously filed U.S. application would reactivate the requirements of sections 184 and 185 with respect to filing abroad an application disclosing the added information.

The PTO regulations broadly interpret the statutory prohibition, recognizing that, in a licensing petition based on a corresponding U.S. application, the *"subject matter* licensed will be measured by the disclosure of the United States application." 37 CFR 5.14(a) (1977) (emphasis added). The regulations continue:

§ 5.14 Petition for license; corresponding U.S. application.

\*    \*    \*    \*    \*    \*

(c) Where the application to be filed abroad contains *matter not disclosed* in the United States application or applications, including the case where the combining of two or more United States applications introduces *subject matter not disclosed* in any of them, a copy of the application as it is to be filed in the foreign country must be furnished with the petition. If, however, all *new matter* in the application to be filed is readily identifiable, the *new matter* may be submitted in detail and the remainder by reference to the pertinent United States application or applications.

37 CFR 5.14(c) (1977) (emphasis added). Similarly, 37 CFR 5.15(a), (b) (1977) state:

§ 5.15 Scope of license.

(a) A license to file an application in a foreign country, when granted, includes authority to forward all duplicate and formal papers to the foreign country and to make amendments and take any action in the prosecution of the application, pro-

6. Holding that noncompliance with 35 U.S.C. §§ 184, 185 is not overcome by an argument that the claimed invention did not involve national security, the court in *Minnesota Mining and Manufacturing Co. v. Norton Co.,* 144 USPQ 272, 276 (N.D.Ohio 1965) stated:

[I]t is not for the applicant to decide that Section 184 has no application to him. That is not his function. That is not his privilege. That is really not his business. It is the country's business.

Seeking a retroactive license, Gaertner described to the PTO the very approach Congress sought to preclude in enacting 35 U.S.C. §§ 184, 185:

At the time this Example 6 was added to the specification of the corresponding applications to be filed in foreign countries, applicant's undersigned attorney discussed the

matter with the associate in his office responsible for filing the foreign cases. The discussion covered the facts that (1) the scope of the foreign applications was identical with the scope of the parent U.S. application, (2) the Example 6 which was added followed exactly the general method of preparation described in the parent application, (3) the Example 6 which was added differed from Examples 1–5 of the parent application only in the specific disubstituted phosphite employed, and (4) the specific disubstituted phosphite employed in Example 6 was a well-known chemical reactant. Based upon these facts, it was concluded that the added Example 6 was not of such a nature as to require obtaining a foreign filing license since the subject matter of the parent application had then been on file for over six (6) months.

vided *subject matter additional* to that covered by the license is not involved. In those cases in which no license is required to file the foreign application, no license is required to file papers in connection with the prosecution of the foreign application not involving disclosure of *additional subject matter.* Any paper filed abroad following the filing of a foreign application which involves the disclosure of *additional subject matter* must be separately licensed in the same manner as an application.

(b) Licenses separately granted in connection with two or more United States applications may be exercised by combining or dividing the disclosures, as desired, provided *additional subject matter* is not introduced. [Emphasis added]

The recurrent regulatory theme is that the prohibitions of 35 U.S.C. §§ 184, 185 apply to any information or "subject matter" not first disclosed to the PTO in a U.S. application or licensing petition. The regulations have in substance been in effect since 1953. 18 Fed.Reg. 1011 (1953). They thus evidence a longstanding and contemporaneous administrative interpretation of the statutes entitled to great weight. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *In re Marriott-Hot Shoppes, Inc.,* 411 F.2d 1025, 1028, 56 CCPA 1230, 1236, 162 USPQ 106, 109–10 (1969).

### The Present Case

Gaertner's CIP declaration admits that earlier filed foreign counterparts of the CIP disclose "subject matter" not found in his parent. In holding invalid under 35 U.S.C. § 185 a patent issued on a CIP application containing a similar declaration, the Court of Appeals for the Seventh Circuit made no reference to an examination of the actual disclosures involved. *Beckman Instruments, Inc. v. Coleman Instruments, Inc.,*

*supra.* Gaertner's declaration is highly probative of the relationship between contents of his applications. We do not, however, rest our decision solely on that admission.

Example 6 in the CIP, and in its foreign counterparts, teaches use of the reactant di(2-chloropropyl) phosphite not expressly disclosed in the parent. That compound per se is old and well-known. Although the product obtained in Example 6 and claimed in claim 9 is within the class of compounds recited in claim 1, the parent gives no express indication of using di(2-chloropropyl) phospite.

The process steps disclosed in Example 6, though corresponding with the general preparation method recited in the parent, differ in several respects from those set forth in Examples 1 through 5 of the parent. In Example 6, the aliphatic phosphite diester is added to the glycinate-formaldehyde reaction product after the methanol solvent is removed. In the parent, that addition occurs while methanol is in solution. Example 6 proposes a relatively low temperature rotary evaporation technique for separating the methanol solvent whereas the parent uses a relatively high temperature distillation process to achieve separation. The oil product is obtained in Example 6 by concentrating solution in a rotary evaporator starting at less than $20°C$ and up to $100°C$. The oil product in the parent is obtained by heating solution at about $115°C$ for one hour and then cooling. Example 6 teaches the addition of HCL and use of an anhydrous sodium sulfate drying process; neither is taught or disclosed in the parent. Apart from a general allegation that evaporation is an old and well-known separation technique, Gaertner makes no attempt to explain the many differences between the process steps set forth in Example 6 and those described in the parent.[7]

---

7. In his brief, Gaertner reiterates the position taken throughout proceedings before the PTO:

The specification and claims of the instant application differ from those of the parent application in three instances, one of these being the identification of said parent at the

beginning of the specification as required by 37 CFR 1.78(a). The other differences are the addition of Example 6 to the specification * * * and the addition of dependent Claim 9 * * * which is specific to the compound prepared in Example 6.

Thus Gaertner's foreign applications did contain technical information or "subject matter" not previously disclosed in a U.S. application, and the failure to secure a license for foreign filing renders Gaertner's later filed CIP rejectable under 35 U.S.C. §§ 184, 185.

### Gaertner's Arguments

Arguing that he discloses, in all of his involved applications, one invention of broad scope, Gaertner contends that the filing of his parent, containing an enabling disclosure of that "invention," more than six months prior to the filing of his foreign applications, satisfies the requirements of section 184.

The argument misconstrues the purpose of section 184. A disclosure of security material in a foreign application may be no less detrimental for having fallen within the scope of that which an applicant primarily and earlier regarded as his "invention." The statutory language "an application * * * in respect of an invention" (emphasis added) is of sufficient breadth to preclude a limitation of the statute to disclosures made in foreign applications and falling clearly outside the scope of an invention for which a U.S. patent has been sought.[8] Similarly, for purposes of section 184, the question of whether "modifications, amendments, or supplements" of an application constitute "modifications, amendments, or supplements" of the applicant's "invention" is irrelevant. Thus it may be true, but irrelevant, that the specific reactant and process steps first disclosed by Gaertner in Example 6 of his foreign applications do not broaden the compound "invention" recited in generic claim 1 of his parent.

Gaertner next contends that his parent satisfies the enabling requirements of 35 U.S.C. § 112 with respect to the broad invention defined in generic claim 1. That the parent, read as a whole, may be sufficient to teach a person of ordinary skill in the art to use nondisclosed subject matter is, however, irrelevant. Members of the Security Group do not perform their Group function as persons of ordinary skill in the art. It would be totally inappropriate, therefore, to inject into determinations under sections 184 and 185 the full panoply of enablement considerations associated with determinations of compliance with section 112.[9]

Citing *Control Systems Research, Inc. v. Aerotech, Inc., supra* note 8, Gaertner asserts that the board's interpretation of the statute will result in "a veritable flood of

---

Said Example 6 describes the preparation of a compound of the generic formula wherein R and R[1] are 2-chloropropyl. This preparation follows the same general method recited in both the parent and instant specifications. It differs from the preparations described in Examples 1 through 5 only in the selection of the aliphatic phosphite diester, specifically employing di(2-chloropropyl) phosphite, a known compound.
Gaertner did not acknowledge differences in the process steps of Example 6 and those disclosed in the parent until the solicitor's brief directed this court's attention to them.

**8.** We consider incorrect the statements in *Control Systems Research, Inc. v. Aerotech, Inc.,* 429 F.Supp. 914, 917, 195 USPQ 59, 62 (W.D. Pa.1977) and *Beckman Instruments, Inc. v. Coleman Instruments, Inc., supra* at 576, 143 USPQ at 280, suggesting that discrepancies in the U.S. and foreign disclosures must be "essential to the identity of the invention" or related to "essential features" of the invention to be fatal under 35 U.S.C. §§ 184, 185. In *Blake v. The Bassick Co.,* 245 F.Supp. 635, 146 USPQ 160 (N.D.Ill.1965) the applicant had obtained a retroactive license. This incorrect statement in the opinion in *Blake* was therefore dictum:

The court therefore feels that this is a vital distinguishing feature between the *Beckman* case and the instant one; here both [U.S.] applications allegedly covered the *same* invention, and the patentee is therefore entitled to date the six months' period from the filing of the first [parent] rather than the second [CIP] application.

*Blake v. The Bassick Co., supra* at 636, 146 USPQ at 161 (emphasis in original).

**9.** We do not hold that every domestic disclosure must under sections 184, 185 be limited to that which it recites *in haec verbis.* Certain technical information may be so commonly known that it can be said to be *de facto* expressly disclosed. Such instances would, however, fall within a narrow exception to the strict approach mandated by sections 184, 185. The facts of the present case place it well outside that exception.

license requests" by applicants required by other countries to file foreign applications with disclosures differing slightly from their U.S. counterparts. Gaertner's reliance on *Control Systems* is misplaced. The court there stated:

> Defendant, to be sure, takes the position that such demonstration would be superfluous, and that any discrepancy whatsoever suffices to destroy the validity of the U.S. patent. This contention is clearly unacceptable in its most extreme form, since word order in translation and perhaps other changes in literary arrangement might be rendered necessary by the genius of the foreign language. Likewise the idiosyncrasies of practice in the foreign patent office might prescribe formalities forbidding a strictly literal reproduction of the material supporting the application for license.[10]

*Control Systems Research, Inc. v. Aerotech, Inc., supra* note 8, at 917, 195 USPQ at 62 (footnote added). *See also* 37 CFR 5.15(a). Gaertner did not revise his disclosure merely to put it in proper idiomatic form or to meet the formalities of foreign patent offices. Example 6 and claim 9 disclose subject matter, *i. e.*, a specific reactant and specific process steps not previously disclosed.

Lastly, Gaertner suggests that only claim 9, not his entire application, should have been rejected. Section 185, however, denies a patent on "an invention" to one who files a non-licensed foreign application for a patent "in respect of the invention." Gaertner's present foreign applications, containing the "subject matter" of Example 6 and claim 9, are for patents "in respect of" the invention described and claimed in his parent. Gaertner is not entitled, therefore, to a fall-back position in which he merely cancels or abandons all attempt to claim the compound of claim 9 and obtains a patent containing the claims of his parent now copied in his present application.[11] Deletion of Example 6 and claim 9 from his present application could not wash away Gaertner's action in filing his foreign applications without a license. One may not file non-licensed foreign applications, disclosing subject matter additional to and in respect of the subject matter and invention disclosed in a U.S. application, and thereafter escape the effect and intent of sections 184, 185 by merely declining to claim that additional subject matter.

### Conclusion

Neither Gaertner nor this court has authority to determine whether the disclosure abroad of Example 6 and claim 9 would be detrimental to national security. Section 184 assigns that right and duty to the PTO. To reverse the appealed decision in this case would be to condone Gaertner's placing the additional subject matter represented by Example 6 and claim 9 in his foreign applications, and would effectively transfer to Gaertner and this court the determination that disclosure of that subject matter was not detrimental.

Gaertner's CIP application having been properly rejected under 35 U.S.C. § 185, the decision of the board is *affirmed*.

*AFFIRMED*.

---

10. The quotation being inapplicable to the facts before us, we need not discuss its validity. Further, the facts in *Control Systems* support an interpretation that addition of certain figures added no new "subject matter" over a written description of the same figures.

11. That Gaertner could, because his parent had been on file for more than six months, have obtained a patent for the invention in his parent, if his foreign applications had not contained the additional subject matter of Example 6, is irrelevant here.